# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**DESIGN PALLETS, INC., DOUGLAS OLVEY, LARRY SKETO, and STAN SMITH,**

        **Plaintiffs,**

**-vs-**                               **Case No.  6:07-cv-655-Orl-31KRS**

**GRAYROBINSON, P.A.,**

        **Defendant.**

_____

# ORDER

This matter comes before the Court on a Motion to Dismiss Counts I through IX of Plaintiffs' Amended Complaint (Doc. 33) filed by Defendant GrayRobinson, P.A. ("the Law Firm"), and Plaintiffs' Response thereto (Doc. 36).

## I. Background

This action was originally filed in this court on April 23, 2007, by Plaintiffs Design Pallets, Inc. ("DPI"), Douglas Olvey ("D. Olvey"), a member of the Board of Directors of DPI and a shareholder of DPI, and Larry Sketo ("Sketo") and Stan Smith ("Smith"), both shareholders of DPI. Plaintiffs' original complaint (Doc. 1) was dismissed by this Court *sua sponte* as a shotgun pleading (Doc. 28) and Plaintiffs filed an amended complaint (Doc. 31) on June 26, 2007. The following statement of facts is taken from the allegations made by Plaintiffs in their amended complaint.

In February 2000, D. Olvey and Ramon Chimelis ("Chimelis") incorporated DPI to acquire and utilize U.S. Patent No. 6,029,582 ("the '582 Patent"). At the time of incorporation, D. Olvey

was President and CEO and Chimelis was Vice-President and Treasurer; each were 50%

shareholders of DPI and co-chairmen of the DPI Board of Directors ("the BOD").

Shortly after incorporation, D. Olvey and Chimelis each contributed a portion of

their shares of DPI stock to D. Olvey's brother, Michael Olvey ("M. Olvey") in exchange for

services related to acquiring the '582 Patent from its original owner, ultimately leaving D. Olvey

and Chimelis each with approximately 38% of DPI's shares of stock and M. Olvey with

approximately 18%. D. Olvey and Chimelis subsequently purchased the '582 Patent for DPI.

Smith later invested approximately $225,000.00 in DPI and became a shareholder.

Beginning in or around March 2000, M. Olvey began to disrupt DPI operations and to

pressure D. Olvey and Chimelis to either give him total control of DPI and its '582 Patent or pay

him several million dollars in cash and future payments. D. Olvey and Chimelis attempted to put a

halt to M. Olvey's disruptive conduct by agreeing to pay him for some of his stock over time, with

an additional payment once the business was operational. DPI made payments totaling

$676,000.00 to M. Olvey, who only became more disruptive, demanding money faster than DPI

could pay. In March 2001, DPI retained the Orlando law firm of Allen, Dyer, Doppelt, Milbrath

and Gilchrest, PA to file suit against M. Olvey seeking to enjoin his interference with DPI's

business and fund-raising efforts ("the Injunctive Action").

Defendant's records show that DPI originally became a client of the Law Firm sometime in

2000. William Grimm ("Grimm"), a senior partner at the Law Firm, was hired to act as corporate

counsel for DPI and, among other things, help with the offering audit, review DPI's corporate

books and prior dealings and to make certain that DPI's dealings complied with SEC regulations.

In February, 2002, M. Olvey entered into discussions with Frank Hamner ("Hamner") and David Canning ("Canning"), both associates with the Law Firm, regarding his desire to gain control of DPI and its '582 Patent, which he valued at $100 million. Hamner and Canning knew that the Law Firm represented DPI. On or about February 25, 2002, after discussing the scope of the representation with Grimm and obtaining his authorization to proceed, Hamner agreed to represent M. Olvey personally in the Injunctive Action. That same day, Grimm sent, via courier and U.S. Mail, a letter to DPI, D. Olvey, and Chimelis declaring that "our law firm has a conflict which will prevent me from serving as your counsel."

DPI, through D. Olvey and Chimelis, moved to have the Law Firm disqualified from representing M. Olvey in the Injunctive Action. To avoid disqualification, Grimm represented to the court that he had erected a "Chinese Wall" between himself and Hamner regarding DPI and would not discuss DPI with any other lawyer at the Law Firm.

On March 11, 2002, Hamner sent via Certified Mail a "Notice Letter For Insufficient Funds Check" to Chimelis. Plaintiffs allege that Hamner knew that Chimelis had been induced to write the "NSF check" on his personal account by M. Olvey through a false promise to "hold" the check until DPI had paid M. Olvey another $26,250.00. In addition to the March 11th demand, Hamner threatened to have Chimelis criminally prosecuted for writing the check and gave him the alternative option that he would be included in the profits to come from the acquisition of the '582 Patent. In reliance upon Hamner's threats and promises, Chimelis, aligned himself with M. Olvey against the interests of DPI, its investors, and D. Olvey and became a client of the Law Firm.

On December 2, 2002, Hamner conducted a telephonic "board meeting" for DPI, during which Hamner advised Chimelis and M. Olvey (who was not a member of the BOD) to "vote" to

dismiss DPI's Injunctive Action and remove D. Olvey as CEO, even though Chimelis and M. Olvey did not constitute a quorum of DPI's board and the meeting was concealed from D. Olvey. Upon learning of the telephonic board meeting, D. Olvey applied to Florida Circuit Court for a temporary injunction. On December 10, 2002, at a hearing on the temporary injunction, Hamner represented to the court that DPI would be restored to its original position and agreed that all actions taken at the telephonic board meeting would be null and void.

On December 12, 2002, Hamner and M. Olvey, created an "Assignment Agreement," the purpose of which was to assign DPI's interest in the '582 Patent to the Law Firm, as escrow agent for a new company to be formed by M. Olvey and Chimelis. At no time did Hamner or anyone at the Law Firm inform D. Olvey regarding the Assignment Agreement or seek the approval of the BOD for the assignment. The next day, under the direction of Hamner, M. Olvey and Chimelis attempted to hold a special meeting of the BOD, which was attended by Canning and Hamner, who at all times represented that they and their Law Firm were counsel to DPI. The agenda was wholly developed by the lawyers and the script for the meeting was prepared by Canning and called for the ouster of D. Olvey as president and CEO of DPI and for the assignment of the '582 Patent to the Law Firm's escrow account. Grimm reviewed the script and authorized the agenda for this meeting.

As it turned out, because M. Olvey was not a member of the BOD, the December 13, 2002 meeting was invalid due to the lack of a quorum. Hamner nevertheless composed a letter to DPI's shareholders which was sent via U.S. Mail on December 31, 2002 to said shareholders, stating that D. Olvey had been removed from the BOD and M. Olvey had been added thereto. The letter was

relied upon by DPI and its shareholders, with a resultant withdrawal of material support for DPI and loss of shareholder confidence.

On January 27, 2003, Hamner directed M. Olvey to call yet another special meeting of the BOD without giving notice to D. Olvey, this time held at the offices of the Law Firm and attended by Canning, who again wrote the script with Grimm's authorization and for his review, during which actions were taken to facilitate the removal of D. Olvey and the appropriation of the '582 Patent. The January 27, 2003 meeting was invalid due to defective notice to D. Olvey.

On February 4, 2003, Hamner responded to D. Olvey's request on behalf of DPI for minutes of the invalid December and January board meetings by causing to be sent via facsimile transmission and U.S. Mail, a copy of the minutes of the two meetings to D. Olvey, but failed to disclose that the meetings were part of a plan to remove him as a shareholder and appropriate the '582 Patent.

On February 10, 2003, D. Olvey questioned Hamner as to whether there was any intention to sell the '582 Patent. On February 12, 2003, Hamner and Canning prepared and sent via U.S. mail to D. Olvey a notice of an upcoming special board meeting. On February 13, 2003, Ava Doppelt, the attorney originally retained by DPI to prosecute the Injunctive Action, sent an e-mail to Hamner and Canning regarding her understanding that the transfer of the '582 Patent had been accomplished, notwithstanding Canning's earlier assurances to her over the telephone on or about February 12, 2003 "that the company had not done so, and had no intention of removing DPI's asset and leaving the creditors and stockholders hanging out to dry." On February 14, 2003 Hamner replied via e-mail: "Ava, I have no idea of what you are talking about."

On February 14, 2003, at the direction of Hamner and Canning (who wrote the script for the meeting), a third DPI board meeting was held in an attempt to correct the defects in the December 13 and January 27 board meetings. Grimm reviewed the script for the meeting, authorized the agenda, and attended the meeting, where M. Olvey and his wife, Ina Olvey, were added to the BOD.

Before the board meeting on February 14, 2003, Hamner transmitted via courier to M. Olvey and Chimelis a "Plan of Action" to get PalletKraft, Inc., ("PK") off the ground.[1] This "Plan of Action" was prepared by Hamner in consultation with Grimm and Canning and called for the sale of the '582 Patent to PK and additionally called for taking action against D. Olvey, developing a business plan for PK, and capitalizing PK. Hamner and Canning did not send the "Plan of Action" to DPI or D. Olvey.

Hamner and Canning advised DPI to hold another special meeting of DPI's board of directors on April 2, 2003 to clear the way for the sale of the '582 Patent. Canning prepared the script for M. Olvey to follow, Grimm reviewed the script and authorized the agenda, and Canning attended and supervised the meeting, during which he ordered that Smith be ousted, along with a court reporter for attempting to record the details of the meeting. Canning then recorded the minutes to suggest that, while the BOD approved the eventual sale of the '582 Patent, no such sale was actually imminent, and no buyer was in place, representations that Canning knew to be false. On or about April 16, 2003, Canning caused the misleading minutes of the April 2, 2003 meeting to be sent to D. Olvey via U.S. Mail, at all times intending that D. Olvey and DPI rely upon the

---

[1]On January 14, 2003, Canning formed a corporation named PalletKraft, Inc., naming M. Olvey and Chimelis as directors and Canning as registered agent.

representation that there was no imminent sale of the '582 Patent. On April 11, 2003, D. Olvey

e-mailed Hamner in an attempt to obtain clarification of the ramifications of the board meeting the

week earlier. Hamner declined to provide the requested information in an e-mail transmission

stating that "in representing DPI, I take my primary direction from the Board of Directors."

Likewise, on April 11 and 14, 2003, Smith inquired of Hamner regarding the status of the

'582 Patent, and received untruthful answers from Hamner via e-mail. D. Olvey also e-mailed

Hamner on April 17 and 23, 2003, requesting information regarding the status of the '582 Patent

and in response, Hamner transmitted untruthful and misleading messages via e-mail.  At this time,

Hamner had already set in motion the sale of the '582 Patent, which his Law Firm held in escrow

and for which, as of April 7, 2004, the Law Firm had billed M. Olvey $195,039.80.

On May 1, 2003, Hamner confirmed in correspondence addressed to M. Olvey and DPI

that "[t]he rights to the '582 Patent are no longer in DPI's control," and "[t]he '582 Patent will be

transferred to PK . . .upon DPI's receipt of $50,000 from the buyer." While addressed to DPI,

Hamner concealed both the correspondence and its contents from D. Olvey and DPI's

shareholders. On June 2, 2003, the Law Firm's internal e-mails show that $150,021.60 was

transferred by wire to the Law Firm's account, which upon receipt, would "effect the patent

transfer from DPI to PalletKraft Corporation." The Law Firm's internal accounts show a credit of

$60,000.00 toward a balance of $224,072.42 for "SALE OF PATENT" in June, 2003.

On May 6, 2003, D. Olvey filed a lawsuit seeking to enjoin M. Olvey and Chimelis from

transferring the '582 Patent to any entity under their control. In that action, Hamner misrepresented

to the court that the "sale" had actually been a "license agreement," which, as such, would be

impossible to unwind. In fact, a few days before the hearing, on August 25, 2003, Hamner indeed

re-cast the sale of DPI's patent as an "Exclusive License Agreement" to PK. Grimm authorized the language of the agreement.

In an e-mail dated January 22, 2004, Canning recommended that M. Olvey withhold material information and make statements he knew to be false regarding the protection of shareholder interests. Grimm authorized Canning's recommendations.

On March 1, 2004, Hamner created for M. Olvey a term sheet that memorialized M. Olvey's new position as "consultant" to Palletkraft North America Corporation ("PKNA"), providing him a generous salary. Notwithstanding that M. Olvey was on PKNA's payroll, M. Olvey assigned himself the task of "negotiating" a royalty agreement between PKNA and DPI. The obvious conflict in M. Olvey's dual roles was at all times known to Hamner, Canning and Grimm, who nevertheless participated with M. Olvey in the one-sided and improper "negotiations." Hamner, Canning and Grimm created another "exclusive license agreement," this time between PKNA and DPI. This agreement called for transfer of ownership of the '582 Patent to PKNA for $100,000 with a "royalty agreement" that would return to DPI's investors at most approximately $260,000.00 of their $2.5 million investment.

On March 11, 2004, Hamner sent to D. Olvey, via facsimile transmission and U. S. Mail, a document prepared by Hamner reporting that D. Olvey had been removed from the BOD, a fact at all times known by Hamner to be false but upon which he intended D. Olvey to rely. On March 12, 2004, Grimm circulated a memorandum to Hamner and Canning suggesting methods by which the lawyers could aid in divesting D. Olvey of his DPI shares. On April 20, 2004, Hamner sent a letter to Richard Johnston, Esq., a DPI shareholder, via facsimile and U.S. Mail, in which he declared "Doug Olvey owns no shares in DPI," a statement at all times he knew to be absolutely false.

In October, 2004, D. Olvey filed suit in Florida's Fifth Circuit against DPI, PK, PKNA, M. and Ina Olvey, and Chimelis. In mid-December, 2004, Hamner telephoned counsel for D. Olvey and DPI's shareholders to complain that this suit should not have included any allegations regarding his or the Law Firm's participation because he was not aware of the purpose behind the conduct of M. Olvey and Chimelis regarding the transfer of the '582 Patent. Hamner signed a statement on December 27, 2004 and returned the signed letter to D. Olvey's counsel on January 3, 2005 via U.S. Mail with the intent that D. Olvey and DPI's shareholders rely on the misrepresentation and not pursue allegations against the Law Firm and Hamner. In reliance upon Hamner's written representation denying any participation in the scheme, D. Olvey did not pursue allegations against Hamner and the Law Firm in January, 2005.

On July 5, 2005, Canning, who was still with the Law Firm, received an e-mail inquiry concerning a request of a DPI Shareholder named Ken Becker for the physical stock certificates of the 25,000 shares he owned pursuant to an earlier transfer from D. Olvey. Hamner sent Ken Becker a letter dated June 27, 2005 via Certified Mail, wherein he represented that the "Board of Directors of DPI will consider the stock transfer request of 25,000 shares of DPI stock . . . at the next meeting." At all times Hamner knew that the BOD would consider no such thing. In reliance on Hamner's representation, Mr. Becker delayed further inquiries, resulting in PKNA gaining time to establish its business plan using DPI's patent, ultimately causing financial injury to DPI and its shareholders.

## II. Standard of Review

In ruling on a motion to dismiss, this Court must view the complaint in the light most favorable to the Plaintiff. *Scheuer v. Rhodes*, 416 U.S. 232 (1974), and must limit its

consideration to the pleadings and any exhibits attached thereto. FED. R. CIV. P. 10(c); *see also GSW, Inc. v. Long County, Ga.*, 999 F.2d 1508, 1510 (11th Cir. 1993). The Court will liberally construe the complaint's allegations in the Plaintiff's favor. *Jenkins v. McKeithen*, 395 U.S. 411, 421 (1969). Plaintiff must plead "enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct]." *Bell Atlantic Corp. v. Twombly,* 550 U.S. _, _, 127 S. Ct. 1955, 1965 (2007). In ruling on a motion to dismiss, "conclusory allegations, unwarranted factual deductions or legal conclusions masquerading as facts will not prevent dismissal." *Davila v. Delta Air Lines, Inc.*, 326 F.3d 1183, 1185 (11th Cir. 2003).

In reviewing a complaint on a motion to dismiss under Federal Rule of Civil Procedure ("Rule") 12(b)(6), the rule to be applied is that, "courts must be mindful that the Federal Rules require only that the complaint contain 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" *U.S. v. Baxter Intern., Inc.*, 345 F.3d 866, 880 (11th Cir. 2003) (*citing* FED. R. CIV. P. 8(a)). This is a liberal pleading requirement, one that does not require a plaintiff to plead with particularity every element of a cause of action. *Roe v. Aware Woman Ctr. for Choice, Inc.*, 253 F.3d 678, 683 (11th Cir. 2001). Instead, the complaint need only "contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory." *Id.* (internal citation and quotation omitted). "A complaint need not specify in detail the precise theory giving rise to recovery. All that is required is that the defendant be on notice as to the claim being asserted against him and the grounds on which it rests." *Sams v. United Food and Comm'l Workers Int'l Union*, 866 F.2d 1380, 1384 (11th Cir. 1989).

### III. Legal Analysis

*A) The Racketeer Influenced and Corrupt Organization Act ("RICO") Claims*

Counts II through IV of Plaintiffs' Amended Complaint allege violations of 18 U.S.C.

§ 1962 ("§ 1962"). Count II alleges violations of 18 U.S.C. § 1962(b) and Count III alleges

violations of 18 U.S.C. § 1962(c), however, the allegations in these two counts are identical.

Therefore, Count II will be dismissed.[2]

Title 18 U.S.C. § 1964(c) provides a cause of action for "[t]hose private plaintiffs who

have been injured in their business or property by reason of a RICO violation." *In re Managed*

*Care Litig.*, 298 F. Supp. 2d 1259, 1282 (S.D. Fla. 2003). To prove a RICO claim, a plaintiff must

show: "(1) that the defendant (2) through the commission of two or more acts (3) constituting a

'pattern' (4) of 'racketeering activity' (5) directly or indirectly invests in, or maintains an interest

in, or participates in (6) an 'enterprise' (7) the activities of which affect interstate or foreign

commerce." *McCulloch v. PNC Bank, Inc.*, 298 F.3d 1217, 1225 (11th Cir. 2002); *see also In re*

*Managed Care Litig.*, 298 F. Supp. 2d at 1273.

#### 1. Racketeering Activity

The RICO statute defines "racketeering activity" as the enumerated crimes listed in 18
U.S.C. § 1961(1), including mail fraud and wire fraud as alleged in this case. 18 U.S.C.
§ 1961(1)(B); *see also* 18 U.S.C. §§ 1341 (mail fraud), 1343 (wire fraud).

The Eleventh Circuit has explained that "mail or wire fraud occurs when a person (1)
intentionally participates in a scheme to defraud another of money or property and (2) uses
the mails or wires in furtherance of that scheme." *Pelletier v. Zweifel*, 921 F.2d 1465, 1498

---

[2]*See Lightning Lube v Witco Corp*. 4 F.3d 1153 (3d Cir. 1993). (Civil pleading claim of injury
under 18 U.S.C. § 1962(b) that employees of defendant were engaged in pattern of racketeering is
insufficient where it merely parrots same injury that § 1962(c) is meant to remedy and fails to explain
what additional injury resulted from person's interest or control of enterprise.)

(11th Cir. 1991). Under the mail and wire fraud statutes, a plaintiff must allege a scheme to defraud wherein "some type of deceptive conduct occurred." *Id.*, 921 F.2d at 1500.

*McCulloch*, 298 F.3d at 1225.

A plaintiff relying on violations of the wire or mail fraud statutes as predicate acts for a civil RICO claim (as Plaintiffs do here) must show not only that those statutes were violated, but also that he suffered an injury that was proximately caused by those violations. *Pelletier v. Zweifel*, 921 F.2d 1465, 1499 (11th Cir. 1991). Further, a plaintiff bringing a civil RICO case predicated upon mail or wire fraud "must prove that he was a target of the scheme to defraud and that he relied to his detriment on misrepresentations made in furtherance of that scheme." *Sikes v. Teleline, Inc.*, 281 F.3d 1350, 1360 (11th Cir. 2002).

Plaintiffs here have alleged that Hamner and Canning sent various documents, via U.S. Mail and/or e-mail, which contained intentional misrepresentations concerning the operation and leadership of DPI, as alleged in paragraphs 23, 32, 37, 39-41, 44, 45, 51-54, 61, 62, 65, 66 and 69 of the Amended Complaint. (Doc. 31 at 32).

Plaintiffs allege that Defendant failed to disclose information about DPI to D. Olvey. "Nondisclosure of material information can constitute a violation of the mail and wire fraud statutes where a defendant has a duty to disclose, either by statute or otherwise." *McCulloch*, 298 F.3d at 1225.  Plaintiffs allege that Defendant owed a fiduciary duty to them and that this failure to disclose caused them harm. Whether Defendant actually owed a fiduciary duty to Plaintiffs cannot and need not be decided at this stage. Therefore, these allegations are sufficient to establish predicate acts.

Plaintiffs also purport to have relied to their detriment on a letter sent to D. Olvey's attorney by Hamner in which he claims to have no knowledge of the purpose behind the conduct of M. Olvey and Chimelis with regard to the '582 Patent. Plaintiffs allege that they relied on this misrepresentation in deciding not to pursue allegations against the Law Firm and Hamner. (Doc. 31 at 20).

Finally, Paragraph 32 refers to a letter sent by Defendant to DPI shareholders, via U.S. Mail, which stated that D. Olvey had been removed from the BOD and had been replaced by M. Olvey. Paragraph 61 alleges that Defendant mailed a similar letter to D. Olvey. Plaintiffs allege that these statements were false. Plaintiffs state that "[t]he letter was relied upon by DPI and its shareholders, with a resultant withdrawal of material support for DPI and loss of shareholder confidence." (Doc. 31 at 9).

Therefore, Plaintiffs have sufficiently alleged at least three predicate acts of racketeering activity, which is sufficient to maintain a claim under RICO.

### 2. Pattern

"[T]o prove a pattern of racketeering activity a plaintiff or prosecutor must show that the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity." *H. J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239 (1989). Thus, to establish a pattern, Plaintiffs must allege both relatedness and continuity. *Id.* at 240.

Relatedness is established if the acts "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Id.* In this case, all of the allegations made by Plaintiff are related in that they involve the same or similar participants, victims and purposes.

-13-

"Continuity is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *H.J. Inc.,* 492 U.S. at 241. "A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time." *Id.* at 242. In this case, Plaintiffs have alleged related predicates occurring over a period of three and a half years, which is a substantial time period. Therefore, Plaintiffs have sufficiently alleged a "pattern" under RICO.

### 3. Enterprise

Under RICO, an enterprise "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4) (2001). "The existence of an enterprise is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *Lockheed Martin Corp. v. Boeing Co.*, 314 F. Supp. 2d 1198, 1209 (M.D. Fla. 2004) (internal citations and quotation marks omitted).

In this case Plaintiffs do not allege that the Law Firm was a member of the corrupt enterprise. (Doc. 36 at 10). Instead, Plaintiffs allege that Hamner and Canning were members of the enterprise[3] and the Law Firm is vicariously liable for their actions.[4] A corporation can be liable for the RICO violations of its employees when "the corporation is actually the direct or indirect

---

[3]The enterprise alleged by Plaintiffs consists of Hamner, Canning, M. Olvey, Ina Olvey, Chimelis, Chambless, PK and PKNA.

[4]Furthermore, the allegations of William Grimm's involvement support a theory of ratification by the Law Firm. *See Cox*, 17 F.3d at 1409.

beneficiary of the pattern of racketeering activity, but not when it is merely the victim, prize, or passive instrument of racketeering." *Cox v. Administrator United States Steel & Carnegie*, 17 F.3d 1386, 1404 (11th Cir. 1994). Here, Plaintiffs allege that the Law Firm received profits from the activities of Hamner and Canning, therefore it can be held liable for their actions. "[L]iability for the acts of one's agents is simply a reality to be faced by corporate entities. With the advantages of incorporation must come the appendant responsibilities." *Id.*

As Plaintiffs have sufficiently alleged all elements required to establish a claim under § 1962(c), Count III will not be dismissed.

### 4. Conspiracy

Count IV alleges a violation of 18 U.S.C. § 1962(d), which states that "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." Defendant's only argument with regard to this Count is that Plaintiffs have failed to state a claim fro substantive RICO violations. For the reasons discussed above, this argument fails and Count IV will not be dismissed.

### B) Florida RICO

Count I alleges a violation of Fla. Stat. § 772.103, the Florida RICO statute. It is undisputed that the same requirements apply to the Florida RICO statute as apply to the Federal RICO statute. (Doc. 33 at 6, n2). However, violation of the Florida RICO statute requires allegations of predicate acts that violated Florida law, rather than Federal law. Plaintiffs allege the following predicate acts with regard to Count I: organized fraud, communications fraud, theft, false official statements, compounding felony, commercial bribery and extortion. Defendant attacks each of these allegations.

### 1. Organized/Communications Fraud

Plaintiffs allege violations of Fla. Stat. § 817.034(4)(a) and (b). First, Defendant argues that Plaintiffs have failed to allege felonious intent. This is untrue as Plaintiffs have alleged intent to defraud and intent to obtain property fraudulently. (Doc. 31 at 25). Defendant also argues that it is not a "person" and cannot be liable under § 917.034, however, as discussed above, Plaintiffs allege that Defendant is vicariously liable for the acts of Hamner and Canning. Finally, Defendant argues that its attorneys never obtained any property from Plaintiffs, however this is not an element of the offense. Therefore, Plaintiffs have successfully alleged the predicate acts of organized and communications fraud.

### 2. Theft

Defendant's arguments regarding theft are essentially the same as those regarding the fraud allegations, and they fail for the same reasons. Therefore, Plaintiffs have sufficiently alleged this predicate act as well.

The allegations of these predicate acts are sufficient to support a claim under the Florida RICO statute, therefore this Court need not and will not address the remaining predicate acts. Count I will not be dismissed.

### C) Legal Malpractice

Count V alleges legal malpractice. Defendant argues that Plaintiffs' allegations are insufficient to allege legal malpractice, however, these arguments have no merit. Defendant also alleges that this claim is time barred by Fla. Stat. § 95.11(4)(a). (Doc. 33 at 19).  Plaintiffs do not respond to this argument because it is only one sentence and has not been "properly briefed" by Defendant. (Doc. 36 at 18). Under Fla. Stat. § 95.11(4)(a), the statute of limitations for an action

for professional malpractice, other than medical malpractice,  is set at two years "provided that the period of limitations shall run from the time the cause of action is discovered or should have been discovered with the exercise of due diligence." Plaintiffs allege that the actions of the Law Firm were not discovered by Plaintiffs until July, 2006. (Doc. 31 at 6). Therefore, it appears that the allegations of the complaint are sufficient to overcome the statute of limitations defense. Therefore, Count V will not be dismissed.

*D) Aiding and Abetting Breach of Fiduciary Duty*

Defendant argues that Count VI must be dismissed because Plaintiffs fail to allege a fiduciary duty. This argument is without merit as Plaintiffs have alleged that Hamner and Canning continually represented themselves as counsel to DPI, and therefore have sufficiently alleged a fiduciary duty. Defendant also argues that Plaintiffs have failed to allege that any breach caused damage to them. This argument is also without merit. Therefore, Count VI will not be dismissed.

*E) Counts VII, VIII and IX*

Defendant also moves to dismiss Counts VII, VIII and IX of Plaintiffs' complaint, however, Plaintiffs fail to respond to these arguments. Still, Defendant's arguments have been previously addressed and/or are without merit. Therefore, it appears to this Court that Plaintiffs have sufficiently alleged causes of action under these three Counts as well, and they will not be dismissed.

**IV. Conclusion**

Accordingly, it is

**ORDERED** that Defendant's Motion to Dismiss (Doc. 33) is **GRANTED** in part and

**DENIED** in part.  Count II of Plaintiffs' Amended Complaint (Doc. 31)  is hereby **DISMISSED**.

**DONE** and **ORDERED** in Chambers, Orlando, Florida on August 6, 2007.

GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Party