**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**DESIGN PALLETS, INC., DOUGLAS**
**OLVEY, LARRY SKETO, and STAN SMITH,**

        **Plaintiffs,**

-vs-                                               **Case No.  6:07-cv-655-Orl-31KRS**

**GRAY ROBINSON, P.A.,**

        **Defendant.**

## ORDER

This matter comes before the Court following a hearing on the Motion for Summary Judgment (Doc. 66) filed by Defendant GrayRobinson, P.A. ("Gray"), Plaintiffs' Response thereto (Doc. 71), Defendant's Reply (Doc. 82) and Plaintiffs' Sur-reply (Doc. 90).

**I. Background**[1]

This action, filed on April 23, 2007, is the latest chapter in a long-running dispute between two brothers – Mike and Doug Olvey (hereinafter "Mike" and "Doug", respectively) – over control of a corporation named Design Pallets, Inc. ("DPI"). DPI was formed in February of 2000, to acquire and exploit U.S. Patent No. 6,029,582 ("the '582 Patent"). Initially, Doug was President and CEO and Ramon Chimelis ("Chimelis") was Vice-President and Treasurer; each held half of

---

[1] The following recitation of facts is based on the documents submitted by both parties in support of, and in opposition to, the Motion for Summary Judgment. No depositions were submitted by either party. Furthermore, the documents submitted by Plaintiffs in particular, were disorganized and largely unauthenticated. However, the Court has done its best to parse through these submissions and compile an accurate time-line of the relevant facts.

the DPI stock and co-chaired the DPI Board of Directors ("the BOD").[2] Shortly after incorporation, Mike acquired an 18% interest, leaving Doug and Chimelis each with approximately a 38% share and Stan Smith as a minority shareholder.

Tension between Mike and Doug surfaced in March of 2000, when Mike began to pressure Doug and Chimelis to either give him total control of DPI and its '582 Patent or pay him several million dollars in cash and future payments. Doug and Chimelis attempted to put a halt to what they perceived to be Mike's disruptive conduct by agreeing to pay him for some of his stock over time, with an additional payment once the business was operational.

The first litigation shot was fired by Doug on February 19, 2002, when he, on behalf of DPI, sued Mike in Florida state court, seeking to enjoin Mike from interfering with DPI's affairs (*DPI v. Olvey*, Case No. CIO 02-1787 in Florida's Ninth Judicial Circuit Court, hereinafter "the Injunctive Action").[3] (Def. Exh. 2-D). A week prior to the filing of the Injunctive Action, William Grimm ("Grimm"), a senior partner at Gray, was hired by Doug to act as corporate counsel for DPI and, among other things, to help with the offering audit, to review DPI's corporate books and prior dealings and to make certain that DPI's dealings complied with SEC regulations.[4]

---

[2]On July 30, 2000, Chimelis and Doug placed their DPI shares in a voting trust, naming Paper Industries, Inc. ("Paper Industries") as the Trustee. (Doc. 76-5). Paper Industries was a company owned by Doug and Chimelis.

[3]Doug, acting on behalf of DPI, was represented in this action by the Orlando law firm of Allen, Dyer, Doppelt, Milbrath and Gilchrest, PA ("Allen, Dyer"), which he had retained in March of 2001.

[4]Plaintiffs alleged that DPI originally became Gray's client sometime in 2000. However, Grimm's engagement letter (Doc. 72-2) is dated February 15, 2002 and there is no evidence in the record to indicate that Gray represented DPI prior to that time.

While Grimm was providing corporate legal advice to DPI, Mike entered into discussions with Frank Hamner ("Hamner") and David Canning ("Canning"), both associates with Gray, regarding his desire to gain control of DPI and its '582 Patent. On or about February 25, 2002, Hamner agreed to represent Mike personally in the Injunctive Action. That same day, Grimm sent a letter to DPI, Doug, and Chimelis declaring that "our law firm has a conflict which will prevent me from serving as your counsel." (Doc. 71-7).

Thus, in late February of 2002, Gray dropped DPI as a client and began representing Mike in his effort to wrest control of DPI from Doug. The events which followed, culminating in the sale of the '582 Patent in June of 2003, constitute the criminal enterprise alleged by Plaintiffs herein to constitute violations of the Federal RICO Act. (*See* Doc. 43 at 27).

On March 11, 2002, Hamner sent a "Notice Letter For Insufficient Funds Check" to Chimelis. (Doc. 71-10).[5] Subsequently, Chimelis, aligned himself with Mike and became a client of Gray.

In approximately April of 2002 Allen, Dyer, on behalf of DPI, moved to have Gray disqualified from representing Mike in the Injunctive Action. To avoid disqualification, Grimm represented to the court that he had erected a "Chinese wall" between himself and Hamner

---

[5]Plaintiffs allege that Hamner sent this letter to induce Chimelis to side with Mike instead of Doug. Chimelis, however, states that he knew Mike had no legal claim against him and was not induced to switch sides by this letter. (Def. Exh. 3).

regarding DPI and would not discuss DPI with any other lawyer at Gray. (Doc. 76-9 at 4).[6] DPI's Motion to Disqualify was denied.

On December 13, 2002, a special meeting of the BOD was held, at which Chimelis and Jerry Chambless ("Chambless") voted to remove Doug from the BOD, to add Mike and his wife, Ina Olvey, and to assign the '582 Patent to Gray's escrow account.[7] Mike, on behalf of DPI, then executed an Assignment Agreement ("the Assignment"), the purpose of which was to assign DPI's interest in the '582 Patent to Gray as escrow agent for a new company to be formed by Mike and Chimelis. (Doc. 72-4).  Later that month, Mike informed Doug that the BOD had voted to dismiss the Injunctive Action and remove Doug as CEO. Upon learning of this, Doug filed a motion for temporary injunction in the Injunctive Action. (Doc. 76-18).

On December 16, 2002, Chimelis sent a letter to Hamner indicating that DPI wanted Gray to represent it in the Injunctive Action. (Doc. 75-16). That same day, Hamner sent an email to Grimm informing him that DPI had terminated its relationship with Allen, Dyer and was in the process of retaining Gray, so there was no more need for the "Chinese wall" to be in place. (Doc. 72-6). Two days later, without filing a notice of appearance or informing Allen, Dyer, Gray filed a notice of dismissal with prejudice on behalf of DPI in the Injunctive Action. (*See* Doc. 72-7).

---

[6]In his affidavit, Grimm indicated that when he began working with Doug, he thought his company was called "Loadek" and that he did not know that Mike's interests were adverse to his client's until sometime after February 14, 2002. (Doc. 76-9 at 3-4). However, in an email dated February 11, 2002, Grimm was informed by Mike Graff (a consultant who referred Doug to Grimm on February 5th) that Loadek might encounter "significant problems" with regard to Mike Olvey. (Doc. 74-2).

[7]At some point prior to this meeting, Chambless had been added to the BOD.

On December 31, 2002, Chimelis sent a letter to DPI's shareholders, stating that Doug had been removed from the BOD and Mike had been added thereto. (Doc. 76-15). As it turned out, because Mike was not a member of the BOD, the December 13, 2002 meeting was invalid due to the lack of a quorum.

On January 27, 2003, DPI held yet another special meeting of the BOD during which actions were taken to facilitate the removal of Doug and appropriate the '582 Patent. (Doc. 76-16). The January 27, 2003 meeting was also invalid, due to defective notice to Doug. (Doc. 73-7 at 1).

On February 11, 2003, Hamner and Canning prepared and sent via U.S. mail to Doug a notice of an upcoming special board meeting scheduled for February 14, 2003. (See Doc. 73-7 at 1). On February 13, 2003, Ava Doppelt, the attorney originally retained by DPI to prosecute the Injunctive Action, sent an e-mail to Hamner and Canning regarding her understanding that the transfer of the '582 Patent had been accomplished, notwithstanding Canning's earlier assurances to her over the telephone on or about February 12, 2003 "that the company had not done so, and had no intention of removing DPI's asset and leaving the creditors and stockholders hanging out to dry." (Doc. 73-8). On February 14, 2003 Hamner replied via e-mail: "Ava, I have no idea of what you are talking about." (Doc. 73-8).

Before the board meeting on February 14, 2003, Hamner transmitted via courier to Mike and Chimelis a "Plan of Action" to get PalletKraft, Inc., ("PK") off the ground. (Doc. 73-9).[8] This plan called for the sale of the '582 Patent to PK, capitalization and development of a business plan for PK and taking action against Doug. The plan was never sent to Doug. That day, a third BOD

---

[8] PK was formed on January 14, 2003 by Mike and Chimelis, with Canning acting as registered agent. (Doc. 73-2).

meeting was held in an attempt to correct the defects in the December 13th and January 27th BOD meetings. (See Doc. 73-7). Grimm attended this meeting, where Mike and his wife, Ina Olvey, were added to the BOD. (Doc. 73-7 at 1,2).

A fourth meeting of the BOD was held on April 2, 2003, at which Mike, Doug, Ina Olvey, Chambless, Chimelis and Canning were present. (Doc. 73-16) The agenda for that meeting, prepared by Gray, indicates that the valuation and sale of the '582 Patent would be discussed. (Doc. 73-16 at 2).

Two weeks later, Doug emailed Hamner to inquire about the plans to sell the '582 Patent. Hamner responded that there was "no plan to sell the patent." (Doc. 73-18). Yet, on May 1, 2003, Hamner confirmed in correspondence addressed to Mike and DPI that "[t]he rights to the '582 Patent are no longer in DPI's control" because DPI had already assigned it to Gray as an escrow agent, and Gray could only transfer it to a new company. (Docs. 73-21 and 73-22).

On May 6, 2003, Doug filed a second lawsuit in Florida state court, seeking to enjoin Mike and Chimelis from transferring the '582 Patent to any entity under their control ("the Second Injunctive Action"). A memo sent by Canning to Grimm on July 28, 2003, indicates that the Patent was sold on June 11, 2003. (Doc. 74-6). However, on August 25, 2003, Hamner re-cast the sale of DPI's patent as a "License and Royalty Agreement." (Doc. 76-21 at 1-4).

On March 11, 2004, Hamner sent to Doug, via facsimile transmission and U. S. Mail, a document prepared by Hamner reporting that Doug had been removed from the BOD. On March 12, 2004, Grimm circulated a memorandum (Doc. 74-17) to Hamner and Canning suggesting methods by which the Gray lawyers could aid in divesting Doug of his DPI shares. In that memo, Grimm noted that 80% of the DPI stock was owned by Doug and Chimelis, and that this stock was

subject to a voting trust which prevented Chimelis from voting his shares adverse to the interest of Doug. Yet somehow Gray was able to put Mike and Chimelis in control of the BOD, even though "there is a dispute as to whether or not Mike Olvey owns a significant percentage of the stock." (Doc. 74-17 at 2).

On March 24, 2004 Hamner filed a motion to dismiss Doug's Second Injunctive Action as moot, asserting that Gray had transferred the '582 Patent back to DPI, which had subsequently licensed it to PK, and thus there was no longer any plan to "sell" the '582 Patent to PK, or any other company under Mike's control. (Doc. 75-14 at 2). This Motion was granted. (*See* Doc. 76-23).

On April 5, 2004, Mike, on behalf of DPI, executed an "Exclusive License Agreement," this time licensing the '582 Patent to PKNA – a company also in Mike's control. (Doc. 76-21 at 16-24).

On September 23, 2005, Doug filed a fourth lawsuit[9], this time in Georgia state court, against, inter alia, Mike, Gray and Hamner. In July, 2006, Mike and the other corporate defendants in the Georgia Action – absent Gray and Hamner – began settlement discussions with Doug and other DPI shareholders. Settlement was reached in December, 2006, under the terms of which Mike, Chimelis and Ina resigned from the BOD and turned over all of their DPI stock, Doug regained control of the BOD and the majority of DPI stock and DPI was given ownership of the '582 Patent subject to an exclusive licensing agreement with PKNA. Upon execution of the

---

[9]In October, 2004, Doug filed a third suit in Florida State Court against DPI, PK, PKNA, Mike and Ina Olvey, and Chimelis.

exclusive license, the '582 Patent was placed into a trust, to be monitored by two trustees – one elected by PKNA and one elected by DPI.

## II. Standard of Review

A party is entitled to summary judgment when the party can show that there is no genuine issue as to any material fact. FED. R. CIV. P. 56(c); *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 458 (11th Cir. 1994). Which facts are material depends on the substantive law applicable to the case. .*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). The moving party bears the burden of showing that no genuine issue of material fact exists. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Watson v. Adecco Employment Svc., Inc.*, 252 F. Supp. 2d 1347, 1352 (M.D. Fla. 2003).

When a party moving for summary judgment points out an absence of evidence on a dispositive issue for which the non-moving party bears the burden of proof at trial, the non-moving party must "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986) (internal quotations and citation omitted). Thereafter, summary judgment is mandated against the non-moving party who fails to make a showing sufficient to establish a genuine issue of fact for trial. *Id*. at 322, 324-25; *Watson*, 252 F. Supp. 2d at 1352. The party opposing a motion for summary judgment must rely on more than conclusory statements or allegations unsupported by facts. *Evers v. Gen. Motors Corp*., 770 F.2d 984, 986 (11th Cir. 1985) ("conclusory allegations without specific supporting facts have no probative value").

"Courts must construe the facts and draw all inferences in the light most favorable to the nonmoving party . . . [e]ven though the facts accepted at the summary judgment stage of the proceedings may not be the actual facts of the case." *Davis v. Williams,* 451 F.3d 759, 763 (11th Cir. 2006) (internal citations and quotations omitted). The Court is not, however, required to accept all of the nonmovant's factual characterizations and legal arguments. *Beal*, 20 F.3d at 458-59. If material issues of fact exist, the Court must not decide them, but rather, must deny the motion and proceed to trial. *Herzog v. Castle Rock Entertainment,* 193 F.3d 1241, 1246 (11th Cir. 1999).

### III. Legal Analysis

   *A) The Racketeer Influenced and Corrupt Organization Act ("RICO") Claims*

Counts III and IV of Plaintiffs' Second Amended Complaint (Doc. 43) allege violations of 18 U.S.C. § 1962 ("§ 1962").[10] Plaintiffs allege that Gray participated in a scheme "to squeeze out Doug from DPI and to give Mike control of DPI and its '582 Patent." (Doc. 31 at 5). The corrupt enterprise alleged by Plaintiffs consists of attorneys Hamner and Canning, DPI shareholders Mike, Ina Olvey, Chimelis and Chambless, as well as two corporations created by Mike and Chimelis: PK and PKNA.

The goal of the alleged scheme was to wrest control of DPI from Doug so that Mike could steal the company's primary asset – the '582 Patent. It is not clear how Mike, as a minority shareholder, was able to gain control of DPI's BOD. Presumably he did so with the support of

---

[10]Section 1962 is a criminal statute, however, 18 U.S.C. § 1964(c) provides a civil cause of action for "[t]hose private plaintiffs who have been injured in their business or property by reason of a RICO violation." *In re Managed Care Litig.*, 298 F. Supp. 2d 1259, 1282 (S.D. Fla. 2003).

Chimelis and Chambless. However, the Chimelis shares appear to have been subject to a voting trust with Doug, which was in effect until July 30, 2004, and there is no explanation in the record of how his shares were voted adverse to Doug. In any event, by April of 2003 Mike, with Gray's help, was exercising control of DPI and the alleged scheme was complete by June 11, 2003, when DPI "sold" the '582 Patent to PK – a company that was also controlled by Mike.

### 1. The *Reves* Operation and Management Test

In order to maintain an action for a substantive RICO violation[11], Plaintiffs must show that Gray participated in the operation or management of the enterprise itself. *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993).

"[A]n attorney or other professional does not conduct an enterprise's affairs through run-of-the-mill provision of professional services." *Handeen v. Lemaire*, 112 F.3d 1339, 1348 (8th Cir. 1997). Plaintiffs argue, however, that the "professional services" provided by Gray were not "run-of-the-mill", but instead "crosse[d] the line between traditional rendition of legal services and active participation in directing the enterprise." (*See* Doc. 71 at 12) (citing *Handeen*, 112 F.3d at 1349). The question, then, is whether Plaintiffs have presented sufficient evidence that Gray's actions crossed that line.

Plaintiffs allege that Gray, on behalf of the alleged corrupt organization, drafted strategy memos, board meeting agendas, letters to shareholders, business plans, sales and license agreements, and various other emails and letters. (Doc. 71 at 12-13). While Plaintiffs may take

---

[11]The *Reves* operation and management test does not apply to RICO conspiracy claims. *See United States v. Browne*, 505 F.3d 1229, 1276 n.33 (11th Cir. 2007).

issue with the advice Gray gave its clients and its actions in facilitating the scheme, they have failed to present any evidence that Gray did anything more than act as legal counsel.

The evidence shows that Gray, beginning in late February of 2002, represented Mike Olvey individually, and then in his capacity as a member of the BOD, in his efforts to gain control of DPI and sell its principal asset to a new entity created by Mike and Chimelis. Even if Gray's conduct fell below the professional standards expected of a lawyer in this community, there is nothing in the record to show that Gray's representation amounts to a RICO violation. This Court asked Plaintiffs' counsel multiple times to provide an example of even one illegal action taken by Gray, and Plaintiffs failed to do so. Instead, Plaintiffs simply pointed to examples of Gray's failure to communicate honestly with Doug about Mike's plan to sell the '582 Patent. Assuming that Gray had a duty of candor, and assuming these statements were actually false, this activity still does not rise to the level of a RICO violation. Therefore, Defendant is entitled to summary judgment on Count III.

### 2. Count IV: RICO Conspiracy

Count IV alleges a violation of 18 U.S.C. § 1962(d), which states that "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." "To be guilty of conspiracy, . . . parties must have agreed to commit an act that is itself illegal – parties cannot be found guilty of conspiring to commit an act that is not itself against the law." *Jackson v. Bellsouth Telecomms.*, 372 F.3d 1250, 1269 (11th Cir. 2004). Here, Plaintiffs have failed to produce any evidence that the Law Firm agreed to do anything other than provide legal services. Furthermore, Plaintiffs have presented no evidence that any actions taken

-11-

by any member of the alleged enterprise were illegal. Therefore, Defendant is entitled to summary judgment on Count IV as well.

*B) State Law Claims*

Having disposed of all of the federal claims in this matter, this Court declines to exercise supplemental jurisdiction over the remaining state law claims. Therefore, Counts I and V will be dismissed without prejudice so that Plaintiffs may file them in state court.

**IV. Conclusion**

Accordingly, it is **ORDERED** that Defendant's Motion for Summary Judgment is **GRANTED**. Counts I and V are **DISMISSED** without prejudice and judgment shall be entered in favor of Defendant GrayRobinson, P.A. on Counts III and IV. All pending motions are **DENIED** as moot and the Clerk is directed to close the file.

**DONE** and **ORDERED** in Chambers, Orlando, Florida on August 5, 2008.

GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Party